*764 Opinión disidente emitida por el
Juez Asociado Señor Es-trella Martínez.
La decisión que hoy acoge la mayoría de este Tribunal aprueba la actuación de la Oficina de Exención Contribu-tiva Industrial (OECI) para enmendar sustantivamente un decreto de forma retroactiva sin autoridad legal y en con-travención a la intención legislativa plasmada en la Ley de Patentes Municipales, 21 L.P.R.A. sec. 651 et seq., según enmendada, y la Ley Núm. 135-1997, Ley de Incentivos Contributivos de 1998 (13 L.P.R.A. sec. 10101 et seq.).
Respetuosamente, no coincido con la mayoría de este Tribunal en que la OECI tiene la facultad para enmendar de forma retroactiva un decreto de incentivo contributivo. Tampoco puedo categorizar que las actuaciones por la OECI constituyen una mera aclaración cuando en realidad éstas son una enmienda sustantiva con carácter retroac-tivo de un decreto. El efecto de la determinación de la ma-yoría repercute en la autoridad delegada a los municipios para imponer y cobrar contribuciones en sus límites territoriales. De esta forma, se abren las puertas a crear un estado de incertidumbre en la planificación de la admi-nistración de los fondos públicos municipales y se propicia la inestabilidad fiscal de los municipios, al avalarse su-puestas “aclaraciones” retroactivas de forma sorpresiva y que tienen un impacto negativo millonario al fisco.
I
PepsiCo Puerto Rico, Inc. (PepsiCo) es una corporación que opera en Puerto Rico y la cual ha estado cobijada por los beneficios de la Sección 936 del Código Federal de Rentas Internas, 26 U.S.C.A. sec. 936. Ésta se acogió al método de contabilidad aprobado en 1982 conocido como profit *765 split, 26 U.S.C.A. sec. 936(h)(5)(C)(ii).(1) Según esta regla contable, para determinar su obligación contributiva al fisco, PepsiCo se beneficiaba de distribuir el ingreso tribu-table en un cincuenta por ciento a su matriz en Estados Unidos y el restante a su afiliada en Puerto Rico. De igual forma, desde 1977 gozó de exenciones contributivas locales a través de decretos emitidos por el Gobierno de Puerto Rico al amparo de las distintas leyes de incentivos industriales. En ese entonces, los decretos a favor de Pep-siCo disponían que, para efectos de computar el pago de patentes municipales, el volumen de negocio sería el cin-cuenta por ciento de éste si la empresa estaba acogida al método de profit split.
Como las distintas leyes de incentivos contributivos se establecen por periodos determinados, PepsiCo solicitó una nueva exención contributiva en 2000 conforme a la Ley Núm. 135-1997, Ley de Incentivos Contributivos de 1998, supra. A tales efectos, la Oficina de Exención Contributiva Industrial (OECI) adscrita al Departamento de Estado tra-mitó la solicitud y el Secretario de Estado aprobó el decreto el 3 de febrero de 2000 (decreto del 2000). El decreto (98-135-I-111) disponía, en lo pertinente, como sigue:
BE IT FURTHER DECREED, that pursuant to Section 6(b)(2) of the Act, Grantee shall enjoy sixty percent (60%) exemption form license fees, excises, and other Municipal Taxes of: (i) July 1, 2000 with respect to the production of concentrate products, and (ii) July 1, 2002 with respect of the production of snack foods and pork rind pellets (“chicharrones”).
*766 Conforme al lenguaje claro del decreto, PepsiCo pagaría patentes por el cuarenta porciento de su volumen de negocios. Posteriormente, el 5 de agosto de 2002, el decreto se enmendó para incluir a Pepsi-Cola Manufacturing International, Limited (Pepsi-Cola), como beneficiario adicio-nal (98-135-1-111-A). Luego, Pepsi-Cola adquirió de Pepsi-Co la planta manufacturera de concentrado de bebidas en el municipio de Cidra, y continuó con las operaciones de producción. (3)
El inicio de la controversia ante nos surge cuando el municipio de Cidra notificó el 16 de agosto de 2005 una deficiencia de $15,087,134.66 en el pago de patentes muni-cipales para los años contributivos de 2000 a 2004. La de-ficiencia notificada respondió a que Pepsi no incluyó el cin-cuenta por ciento de su volumen de negocios para el pago de patentes municipales. Es decir, Pepsi únicamente pagó patentes municipales por el cuarenta por ciento de la mi-tad de su volumen de negocios.
El 19 de agosto de 2005, Pepsi impugnó la deficiencia notificada, por lo que se celebró la vista correspondiente. Luego de los trámites de rigor, el 14 de diciembre de 2005, el municipio de Cidra emitió su decisión final sobre la deficiencia. Pepsi solicitó el juicio de novo ante el Tribunal de Primera Instancia. (4)
Mientras se llevó a cabo el proceso de deficiencia ante el municipio de Cidra, Pepsi solicitó el 14 de noviembre de 2005 ante la OECI “a request for Amendment of Tax Exempcion Grant, Case, No. 98-135-1-111”.(5) Argumentó que ello era con el propósito de clarificar que determinaron correctamente el volumen de negocios para el pago de pa-tentes municipales. El municipio de Cidra se opuso a la enmienda solicitada ante la OECI. A pesar de ello, el 2 de *767 junio de 2006, se aprobó con efecto retroactivo la enmienda al decreto de 2000 solicitada por Pepsi. A estos efectos, la nueva enmienda (98-135-III-111-C) estableció como sigue:
BE IT FURTHER DECREED, that pursuant to Section 6(b) of the Act, Grantee shall enjoy sixty percent (60%) exemption form license fees, excises, and other Municipal Taxes of: (i) July 1, 2000 with respect to the production of concentrate products, and (ii) July 1, 2002 with respect of the production of snack foods and pork rind pellets (“chicharrones”), provided that Grantee’s sales volume with respect to sales covered by profit-split election under Section 936 of the United States Internal Revenue Code of 1986 shall be fifty percent (50%) of the sales amount, and it sales volume with respect to sales covered by the cost sharing election shall be one hundred percent (100%) of the sales amount. (Énfasis suplido).
La enmienda repercutió en los procedimientos de juicio de novo relacionados con la deficiencia notificada por el municipio de Cidra y ante la consideración del Tribunal de Primera Instancia. Ante la realidad del nuevo decreto, el municipio trajo como tercero demandado al Estado y a la OECI para declarar nula la enmienda al decreto de exen-ción al sostener que se actuó de forma ultra vires. Por su parte, el Estado solicitó la desestimación de la demanda en su contra y sentencia sumaria a su favor. El municipio se opuso.
En lo relevante, el Tribunal de Primera Instancia emi-tió, el 29 de marzo de 2007, una sentencia en la que dejó sin efecto la determinación de deficiencia del municipio de Cidra y declaró “no ha lugar” la demanda del municipio contra el Estado y la OECI. Para ello, el foro primario con-cluyó, entre otras, que cuando la OECI aprobó “la en-mienda al decreto de exención contributiva industrial con aplicación retroactiva al 3 de febrero de 2000 la controver-sia planteada quedó aclarada por lo que la determinación del Municipio Autónomo de Cidra en torno a las deficien-cias notificadas a Pepsi no puede prevalecer”.(6)
*768 Ante ese cuadro fáctico, el municipio de Cidra acudió oportunamente ante el Tribunal de Apelaciones. Original-mente, el 10 de agosto de 2007, el foro intermedio emitió orna sentencia en la que revocó al Tribunal de Primera Ins-tancia y ordenó la celebración de un juicio en su fondo por entender que existían controversias materiales que impe-dían dictar sentencia sumaria. A pesar de ello, el Tribunal de Apelaciones confirmó al foro primario a los efectos de la determinación sobre la competencia del tribunal de instan-cia para revisar la enmienda al decreto realizada a base de la Ley de Incentivos Contributivos de 1998.
Posteriormente, y luego de sendas solicitudes de recon-sideración, el Tribunal de Apelaciones emitió, el 15 de diciembre de 2007, una sentencia en reconsideración. En ésta última revocó en su totalidad la sentencia del Tribunal de Primera Instancia y devolvió el caso a ese foro para la celebración de un juicio en su fondo. Entre otras contro-versias, señaló que la enmienda retroactiva no podía pri-var al municipio de Cidra de su facultad para imponer pa-tentes municipales.
La sentencia en reconsideración dio lugar a la presenta-ción de dos recursos ante este Tribunal. Pepsi compareció mediante el recurso de certiorari Núm. CC-2008-0136 y el Estado, por su parte, mediante el Núm. CC-2008-0140. Ambos recursos fueron expedidos y consolidados por este Tribunal.
HH 1 — 1
En cuanto a los planteamientos sobre la legitimación activa del municipio de Cidra para impugnar la determi-nación de la OECI, y la facultad de este Tribunal para revisar las actuaciones de esa entidad a los fines del de-creto enmendado, coincido con la opinión mayoritaria.(7)
*769 Por otra parte, discrepo en que Pepsi cualifique para una exención al pago de patentes municipales adicional a la que obtuvo al aprobarse el decreto de 2000 al amparo de la Ley de Incentivos Contributivos de 1998. Diverjo en cuanto a que la Ley de Incentivos de 1998 permite la en-mienda de decretos con carácter retroactivo, cuyo efecto real es modificar la facultad de los municipios en el cobro de patentes municipales a base del decreto originalmente emitido. Entiendo que ello es contrario a la ley y al orden público y constituye un detrimento a fortalecer el erario municipal en favor de sus ciudadanos. Veamos.
hH hH HH
A. La Sección 936 del Código Federal de Rentas Internas, los incentivos contributivos en Puerto Rico y las patentes municipales
La Sección 936 sirvió como la fuente principal para el desarrollo económico de Puerto Rico. Esta constituyó la base para que empresas extranjeras invirtieran en nuestra jurisdicción al concederles un incentivo contributivo. La Sección 936 proveía una exención a modo de crédito contri-butivo sobre todos los ingresos derivados por las empresas norteamericanas en Puerto Rico relacionados con los nego-cios en la isla de cumplirse ciertas condiciones. F. Hernán-dez-Ruiz, A guide across the spectrum of Section 936, 19 Rev. U.I.P.R. 131 (1984).
Posteriormente, los beneficios de la Sección 936 sufrie-ron modificaciones sustantivas para atender la preocupa-ción del Tesoro de Estados Unidos con relación a la meto-dología empleada para aprovecharse de los beneficios que ésta disponía y el efecto de los favores contributivos versus el objetivo de la Sección 936. C.E. Díaz Olivo, La autono- *770 mía de Puerto Rico y sus lecciones en términos fiscales y económicos, 74 Rev. Jur. U.P.R. 263, 280 (2005).(8)
Como consecuencia, la Sección 936 sufrió varias en-miendas entre las que destacamos la de 1982. En lo perti-nente, se incluyó el denominado profit split como un mé-todo contable para la distribución del ingreso sujeto al pago de contribuciones sobre ingresos. Según este procedi-miento se ofreció como alternativa prorratear a razón de cincuenta por ciento el ingreso sujeto a contribución a la corporación operando bajo la Sección 936 y el otro cin-cuenta por ciento a su afiliada en Estados Unidos. Hernán-dez-Ruiz, supra, págs. 146 — 147.
Por su parte, y dentro de la estrategia de desarrollo eco-nómico local, el Gobierno de Puerto Rico propició varias leyes de incentivos industriales. Véase Pfizer Pharm. v. Mun. de Vega Baja, 182 D.P.R. 267 (2011). En lo que con-cierne al caso de autos, las leyes de incentivos de 1948, la de 1954 y la de 1963 disponían una exención total de su ingreso a los negocios elegibles declarados como tal por el Gobernador. Estas legislaciones disponían expresamente que los negocios exentos no estarían sujetos al pago de las patentes, los arbitrios y otras contribuciones municipales impuestas por cualquier ordenanza de cualquier municipalidad. Véanse: 1948 Leyes de Puerto Rico 482; 13 L.P.R.A. secs. 10001(c) y 10012(c).
Posteriormente, se aprobó la Ley de Incentivos Indus-triales de Puerto Rico de 1978 (13 L.P.R.A. sec. 10024 et seq.). Según esta pieza legislativa se incorporó, por pri-mera vez, el mecanismo de exención parcial sobre la tributación. Mediante ésta, como regla general, Puerto Rico impuso una contribución retenida en el origen del diez porciento de los ingresos tributables. Véase 13 L.P.R.A. sec. 10026(a). Diez años más tarde, la Ley de Incentivos Con- *771 tributivos de 1987, siguió el modelo de la ley de 1978 de exenciones parciales. 13 L.P.R.A. sec. 10040.
Con relación al pago de patentes, tanto la Ley de Incen-tivos Industriales de Puerto Rico de 1978 como la Ley de Incentivos Contributivos de 1987, contenían disposiciones expresas sobre las exenciones relacionadas con el pago de las patentes municipales.
Por su parte, la ley de 1978 dispuso que los negocios exentos no estarían sujetos al pago de las patentes, arbi-trios y otras contribuciones municipales. 13 L.P.R.A. sec. 10026(c). Sin embargo, la ley de 1987 disminuyó el benefi-cio a los negocios exentos al disponer que solamente goza-rían de un sesenta por ciento de exención sobre el pago de las patentes, los arbitrios y las contribuciones municipales. 13 L.P.R.A. sec. 10040(c). La razón de este cambio respon-dió al reclamo de los alcaldes sobre la necesidad de obtener mayores recursos en sus municipios. Véase el Debate sobre el P. del C. 1302 de 8 de agosto de 1991, pág. 42.
Este escenario conllevó la aprobación del P. del C. 1302 que se convirtió en la Ley Núm. 82-1991, supra, para en-mendar la Ley de Patentes Municipales. El propósito general de la Ley Núm. 82, supra, consistió en fortalecer la segunda fuente de ingresos de los municipios para otorgar-les mayor autonomía fiscal en aras de mejorar los servicios que éstos prestan a la ciudadanía.
Por otra parte, y debido a las diferencias en el trato al cobro de patentes municipales por las distintas leyes de incentivos industriales, se recomendó que la Ley de Paten-tes Municipales excluyera los fondos 936 del cómputo de patentes municipales. El Secretario de Hacienda expuso la preocupación de empresas que operaban según las leyes de incentivos industriales. Ello, debido a que los municipios pretendían impugnar la exención contributiva total conce-dida por las leyes de incentivos industriales anteriores a las de 1987. Por tal razón, el 5 de junio de 1991, el Secre-tario de Hacienda propuso que la Ley de Patentes Munici- *772 pales reconociera una exención para aclarar el panorama. Para ello recomendó se creara la exoneración siguiente al pago de patentes municipales:
Los ingresos provenientes de fondos elegibles invertidos de conformidad con la Sección 2(j) de la Ley Núm. 8 del 24 de enero de 1987, según enmendada [Ley de Incentivos Contributivos de Puerto Rico de 1987], y leyes de incentivos industria-les anteriores y subsiguientes, devengados por un negocio que es o fue un negocio exento bajo cualesquiera de dichas leyes. (Énfasis suplido.) Véase Ponencia del Secretario de Hacienda del 5 de junio de 2011 sobre el P. de la C. 1302, Decimosexta Asamblea Legislativa, Sexta Sesión Ordinaria, pág. 6.
De igual forma, se expresó la Asociación de Industriales de Puerto Rico en su Ponencia de 13 de junio de 1991 sobre el P. de la C. 1302, pág. 10. Ésta enunció como fundamento adicional que el Departamento de Hacienda reconocía cier-tos ajustes a las empresas 936 para fines de la contribución sobre ingresos, por lo que entendió que era apropiado reconocer ese privilegio para propósitos de la patente municipal. Por su parte, el Banco Gubernamental de Fo-mento para Puerto Rico aclaró el 13 de junio de 1991 que cualquier aumento en el por ciento de las patentes que se declaran a favor del municipio tiene el efecto de rebajar la contribución sobre ingresos de las corporaciones. Ello de-bido a que el pago por patentes “es totalmente deducible cuando se realiza el cómputo de la responsabilidad contri-butiva anual de los negocios”. Véase Ponencia del Banco Gubernamental de Fomento para Puerto Rico sobre el P. del C. 1302 de 13 de junio de 1991.
Por su parte, del Informe de la Administración de Fomento Económico con relación al P. del S. 1056 relacionado con el P. de la C. 1302 de 28 de mayo de 1991 recomendó que se limitara la exención por el pago de patentes muni-cipales a las leyes de incentivos de 1987 y anteriores a ésta. Así, entendió que procedía eliminar cualquier refe-rencia a los efectos de leyes de incentivos subsiguientes. La razón para ello consistió en limitar el objetivo de la Ley *773 Núm. 82, supra, a esclarecer la situación existente para los municipios.
Finalmente, la Ley Núm. 82, supra, fue aprobada y como consecuencia el inciso 27 de la Sec. 9 de la Ley de Patentes Municipales, 21 L.P.R.A. sec. 651h(27), permitió la exención por el pago de patentes municipales a los ne-gocios acogidos a las leyes de incentivos industriales hasta el 1987 al emplear el lenguaje siguiente:
Los ingresos, no atribuibles a operaciones en Puerto Rico, de corporaciones exentas bajo [la Ley Núm. 8 de 24 de enero de 1987, según enmendada, y leyes de incentivos industriales anteriores], de conformidad con las disposiciones de las Secciones 936 y 482 del Código de Rentas Internas Federal. (Énfasis suplido).
Ahora bien, el 31 de julio de 1996, el Congreso de Estados Unidos estableció un plazo de diez años para la elimi-nación de la Sección 936. Durante ese período, y consciente de ello, la Asamblea Legislativa de Puerto Rico aprobó la Ley Núm. 135-1997, Ley de Incentivos Contributivos de 1998 (13 L.P.R.A. sec. 10101 et seq.), cuya vigencia culmi-naría el 31 de diciembre de 2007. Al aprobarla, la Asam-blea Legislativa consideró el cambio en los modelos econó-micos a nivel mundial y la necesidad de contar con un mecanismo de incentivos contributivos autóctonos. Véase la Exposición de Motivos de la Ley Núm. 135-1997 supra.
En cuanto al pago de patentes, la Ley de Incentivos Contributivos de 1998 dispone que los negocios exentos que poseen un decreto otorgado según ésta, gozarán de un sesenta por ciento hasta un noventa por ciento de exención sobre patentes, arbitrios y contribuciones municipales de-pendiendo del tipo de negocio. 13 L.P.R.A. sec. 10105(b). Lo expuesto refleja que la Ley de Incentivos Contributivos de 1998 siguió el patrón establecido en la Ley de Incentivos de 1987 a los efectos de no permitir una exoneración total por el pago de patentes municipales. A pesar de ello, y contra- *774 rio a lo que pasó al aprobar la Ley Núm. 82-1991, la Ley de Patentes Municipales no fue enmendada al aprobarse la Ley de Incentivos Contributivos de 1998 para permitir que los negocios exentos no pagaran las patentes municipales en su totalidad.
El historial expuesto refleja que indudablemente no existía una obligación de pagar patentes municipales a los negocios exentos al amparo de las leyes de incentivos in-dustriales cobijados hasta el 31 de diciembre de 1997.(9) Ello no aplicó automáticamente a aquellos negocios que disfrutaron decretos a base de la Ley de Incentivos Contri-butivos de 1998.
Ante tal realidad, la opinión mayoritaria se da a la ta-rea de auscultar la posibilidad de que un decreto al amparo de la Ley de Incentivos Contributivos de 1998 pueda en-mendarse y tener un efecto retroactivo. Es de ese análisis del cual discrepamos.
B. Validez de la enmienda al decreto del 2000 y su efecto retroactivo
Al amparo de la Ley de Incentivos Contributivos de 1998 se concedían exenciones sobre el pago de patentes municipales conforme a los decretos emitidos a estos efectos. Por su naturaleza, las exenciones de contribucio-nes industriales constituyen un instrumento para fomen-tar la industria y la inversión productiva. Textile Dye Works, Inc. v. Srio. de Hacienda, 95 D.P.R. 708, 713 (1968). Sin embargo, ello no implica que éstos no deban cumplir con ciertos requisitos y que las partes no queden obligadas a base de sus términos.
La naturaleza de estos decretos es contractual entre el Gobierno y el concesionario, sus accionistas, socios o due- *775 ños, cuyo periodo tenía una vigencia entre diez a veinti-cinco años dependiendo del área en la que se localiza la empresa. 13 L.P.R.A. secs. 10112(f) y 10105(d); Pfizer Pharm. v. Mun. de Vega Baja, supra; Qume Caribe, Inc. v. Srio. de Hacienda, 153 D.P.R. 700, 730 (2001); Textile Dye Works, Inc. v. Srio. de Hacienda, supra. Es por ello que, una vez emitido el decreto, las partes estaban obligadas al cumplimiento de lo dispuesto en éste con todas sus condiciones. Además, este Tribunal ha resuelto que, cuando los términos del decreto eran claros y no dejaban lugar a dudas sobre la intención de las partes, el decreto se entendería en su sentido literal. Pfizer Pharm. v. Mun. de Vega Baja, supra, pág. 283; Qume Caribe, Inc. v. Srio. de Hacienda, supra, págs. 729-730.
A grandes rasgos, el proceso para conceder estos decre-tos consiste en una solicitud presentada ante el Director de la OECI, adscrita al Departamento de Estado. Esta se re-mitía al Secretario de Hacienda para que verificara el cum-plimiento de los accionistas con sus responsabilidades con-tributivas y al Administrador de Fomento Económico, o aquellas agencias o instrumentalidades pertinentes. Even-tualmente, se preparaba un proyecto de decreto que era circulado entre las agencias concernidas, así como al mu-nicipio correspondiente y al Centro de Recaudaciones de Impuestos Municipales para la evaluación económica y fiscal pertinente. 13 L.P.R.A. sec. 10112(j)(2). Luego de la eva-luación correspondiente y la recomendación del Director de la OECI, el Secretario de Estado emite una determinación final sobre la concesión del decreto. 13 L.P.R.A. sec. 10112. Estas decisiones y determinaciones se consideran como finales y no procedía su revisión, excepto en ciertas circunstancias. 13 L.P.R.A. sec. 10114. Indudablemente, una de las instancias en las que procede la revisión sobre estas determinaciones es cuando éstas son ultra vires.
*776 Como expresamos en Pfizer Pharm. v. Mun. de Vega Baja, supra, pág. 283,(10) “cada Decreto es único y su nego-ciación ha conllevado un estricto análisis de la solicitud y las circunstancias particulares de los contratantes. El De-creto incluye, además, la participación del municipio concernido”. Así, el decreto especifica las condiciones me-diante las cuales se otorga la exención contributiva solici-tada, el porcentaje de ésta, término de duración y otras condiciones. Qume Caribe, Inc. v. Srio. de Hacienda, supra, pág. 720. Debemos recordar que las leyes de incentivos in-dustriales no constituyen leyes de contribuciones sobre ingresos. Su propósito consiste en establecer una exención contributiva a empresas que se dedican a ciertas actividades. Id., pág. 726.
Al examinar la Ley de Incentivos Contributivos de 1998, coincidimos que el estatuto permite la concesión de exen-ciones sobre el pago de patentes municipales. Véase 13 L.P.R.A. sec. 10105(b). De esta forma, se reguló la potestad de los municipios para imponer el cobro de patentes a aquellos negocios elegibles al amparo de la Ley de Incenti-vos Contributivos de 1998. Asimismo, reconocemos la dis-creción al emitir los decretos mediante este estatuto y la obligación de los municipios a respetar estos acuerdos.
A pesar de ello, no podemos avalar la contención de la mayoría de este Tribunal sobre las actuaciones realizadas posterior a la deficiencia notificada a Pepsi por el munici-pio de Cidra a base del decreto emitido en el 2000. De igual forma, entendemos que —en efecto— el decreto del 2000 fiie enmendado retroactivamente.
*777 Al revisar la Ley de Incentivos Contributivos de 1998 notamos que el estatuto contempla la posibilidad de en-miendas a las concesiones aprobadas y la renegociación, conversión y extensión del decreto. Véase 13 L.P.R.A. secs. 10112(j)(2) y 10107. Sin embargo, no encontramos que la Asamblea Legislativa haya delegado la facultad de enmen-dar de forma retroactiva un decreto emitido a base de ésta. Por el contrario, cuando se refiere a renegociaciones, con-versiones o extensiones del decreto, la ley dispone varios factores que se han de considerar entre los que destaca el remanente del período del decreto para que se pueda obte-ner un nuevo decreto con beneficios contributivos ajustados. 13 L.P.R.A. sec. 10107. A su vez, la ley considera la posibilidad de que los decretos posean una enmienda posterior para cubrir operaciones en otros municipios. 13 L.P.R.A. sec. 10105(b)(1). Entendemos que ello responde a que al evaluar la concesión de un decreto se considera la repercusión económica que ello conlleva para distintas en-tidades incluyendo los municipios. Es por ello que, como parte del proceso, se envía copia de la solicitud a los muni-cipios para la evaluación económica y fiscal correspondiente. Por lo tanto, un cambio —como el de autos— en el decreto emitido afecta los fondos públicos e in-gresos municipales con los que un municipio contó para establecer su presupuesto en beneficio de sus ciudadanos. Tal actuación es contraria al orden público y la ley.
IV
Los hechos ante nos revelan que Pepsi disfrutaba de un decreto de exención concedido al amparo de la Ley de In-centivos Contributivos de 1998. Este disponía para una exención del sesenta por ciento del pago de patentes municipales. Así, sus términos eran claros y sin ambigüe-dades, por lo que Pepsi se obligó a ellos. Conforme a lo establecido por el decreto, el Municipio determinó y noti- *778 ficó una deficiencia, porque Pepsi solo incluyó el pago por el cuarenta por ciento de la mitad del volumen de su nego-cio para el cómputo de su patente municipal. Esta adujo que ello respondió a su elección del método de profit split para la determinación de su contribución sobre ingresos y a su conclusión errada de que le aplicaba el inciso 27 de la Sec. 9 de la Ley de Patentes Municipales, supra. (11)
Como consecuencia de la notificación de deficiencia, Pepsi solicitó una enmienda a su decreto del 2000. Luego de varios procesos, el decreto fue enmendado para incluir las defensas de Pepsi ante el municipio de Cidra al notifi-car la deficiencia. Con esta actuación, de facto, se enmendó de forma retroactiva el decreto. La Ley de Contribuciones de Incentivos de 1998 no provee para ello.
La opinión mayoritaria sostiene —a base de la solicitud de sentencia sumaria mediante la cual el foro de instancia dispuso del presente caso— que la intención original de Pepsi y el Estado fue eximir la mitad del volumen de ne-gocios de la empresa. No podemos avalar tal razonamiento. Tampoco podemos concluir a base de documentos cuál fue la intención de las partes cuando ésta no consta reflejada en el decreto del 2000.
La enmienda añadió y aumentó la exención contributiva concedida a Pepsi en el decreto del 2000. Esta no consti-tuye una aclaración de que Pepsi seguiría beneficiándose de los beneficios bajo decretos anteriores. El expediente refleja que en ocasiones anteriores, los decretos emitidos a favor de Pepsi expresamente disponían sobre cómo se lle-varía a cabo el cómputo para el pago de patentes munici-pales, no así el decreto emitido en el 2000. La razón para conceder la enmienda consistió en una interpretación de que debía aplicarse a Pepsi los mismos beneficios que ésta *779 tenía al amparo de la Ley de Incentivos de 1987, ya que seguía operando como una empresa 936. Sin embargo, el hecho de que Pepsi operara como una empresa 936 solo repercute en su responsabilidad al pagar contribuciones sobre ingresos. Ello no incide en cómo se realiza el cálculo para el pago de patentes municipales a base del volumen de negocios que esa empresa opera en el municipio de Cidra. (12) Precisamente, tal discrepancia provocó la en-mienda por la Ley Núm. 82, supra, a la Ley de Patentes Municipales para evitar este tipo de controversias. Como vimos, ésta irrefutablemente no aplica a la Ley de Incenti-vos de 1998.
Claro está, reconocemos que la OECI podía promulgar desde el principio un decreto en el cual fijara que el cóm-puto para el pago de patentes se haría conforme el profit split. No obstante, no lo podía hacer de forma retroactiva, ya que ello es contrario a la ley debido a que no le fue una facultad delegada por la Asamblea Legislativa. Además, contraviene el orden público al atentar contra la facultad de los municipios para imponer patentes municipales con-forme a la ley especial para estos fines. De igual forma, no podemos pasar por alto que Pepsi solicitó la enmienda una vez fue determinada la deficiencia por el municipio. Esta actitud nos resulta más antipática y acomodaticia que el cumplimiento con el proceso de notificar una deficiencia seguido por el municipio de Cidra.
A base de lo anterior, opinamos que el decreto a favor de Pepsi, con relación al pago de patentes municipales, sim-plemente le concedía una exención de sesenta por ciento sobre la totalidad de su volumen de negocios. Por lo tanto, el municipio actuó conforme al decreto y la Ley de Incen- *780 tivos Contributivos de 1998 y la de patentes municipales al notificar la deficiencia. Es por ello, que procede devolver el caso de epígrafe al Tribunal de Primera Instancia para que atienda en los méritos la impugnación de deficiencia pre-sentada por Pepsi.
V
Por los fundamentos analizados, disentimos de la opi-nión mayoritaria. En su lugar, confirmaríamos al Tribunal de Apelaciones conforme a lo aquí expresado.

 El método de profit split en su parte pertinente, disponía:
“(ii) Profit split—
“(I) General rule — If an election of this method is in effect, the electing corporation’s taxable income derived from the active conduct of a trade or business in a possession with respect to units of a product produced or type of services rendered, in whole or in part, by the electing corporation shall be equal to 50 percent of the combined taxable income of the affiliated group (other than foreign affiliates) derived from covered sales of units of the product produced or type of service rendered, in whole or in part, by the electing corporation in a possession”. 26 U.S.C.A. sec. 936(h)(5)(C)(ii).

 13 L.P.R.A. sec. 10105(b).

 Para la fácil comprensión de los hechos y la concordancia con la opinión mayoritaria, nos referimos a PepsiCo y a Pepsi-Cola como Pepsi.

 Pepsi prestó una fianza por $16,444,976.79.

 Véase Ap. CC-2008-0136, págs. 126-127.

 Véase Ap. CC-2008-0136, pág. 268.

 Igualmente, declararía “sin lugar” la moción de desestimación presentada por el municipio de Humacao. Asimismo, avalo la exposición que realiza la opinión *769 mayoritaria sobre la Sección 936, sus implicaciones al fisco y sobre la Ley de Paten-tes Municipales y el alcance de la enmienda promulgada a ésta en 1991.

 Véase, además, Lorraine Eden, Puerto Rican Transfers and Section 936, 9 Tax Notes International 37, July 4, 1994, http://www.voxprof.com/eden/Publications/ puertoricantransfersandsection936.pdf (última visita 12 de julio de 2012).

 Éste corresponde al periodo de vigencia de la Ley de Incentivos Industriales de 1987.

 En ese entonces, resolvimos que el municipio de Vega Baja estaba facultado para imponer el pago de patentes municipales a base del decreto concedido según la Ley de Incentivos Contributivos de 1998. La única limitación que le impusimos al municipio fue la cantidad dispuesta en la ley y acordada en el decreto que fue emitido. En ese caso, no estábamos ante una aclaración alegada del decreto o en-mienda a éste. Allí indicamos que no podíamos limitarnos al análisis de si una par-tida es o no tributable para fines del Código de Rentas Internas, pues había un decreto que regulaba la relación de las partes. Según ello, nos limitamos a examinar y avalar las acciones del municipio conforme al decreto emitido.

 No debe existir duda alguna de que la base para la determinación del pago de patentes municipales no necesariamente corresponde o equivale a aquella utili-zada para el pago de contribuciones sobre impuestos. La definición de lo que consti-tuye volumen de negocios es clara y está contemplada en la Ley de Patentes Municipales.

 El volumen de negocios se refiere a los ingresos brutos que recibe o deven-gue una empresa en el municipio en el cual realiza su operación. A los fines de la Ley de Patentes Municipales, el ingreso bruto es la totalidad de ingresos en y fuera de Puerto Rico que sean atribuibles a la operación que se lleva a cabo en cada municipio. 21 L.P.R.A. sec. 651a(7). Los beneficios de la Sección 936 son únicamente para fines de la determinación de la contribución sobre ingresos. Éstos no repercuten automáticamente en la Ley de Patentes Municipales.